UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/06
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

IN RE FOREST LABORATORIES, INC.  :
DERIVATIVE LITIGATION          :
                        :
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

05 cv. 3489 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Plaintiffs Jeff Michelson and Eleanor Turberg, shareholders of Forest

Laboratories, Inc. ("Forest" or the "Company"), bring this derivative action on behalf of

Forest against its directors and officers alleging a breach of fiduciary duty arising out of

defendants' sale of the Company's stock while allegedly misleading shareholders as to

the future prospects of its key products, the antidepressants Celexa and Lexapro.

Plaintiffs bring additional counts alleging breach of fiduciary duty, abuse of control,

gross mismanagement, waste of corporate assets, and unjust enrichment.

Defendants now move to dismiss the Verified Consolidated Shareholder

Derivative Complaint (the "Complaint") pursuant to Rule 23.1 of the Federal Rules of

Civil Procedure for failure to assert well-pled allegations showing that demand upon the

Forest Board of Directors would have been futile. For the reasons set forth below, the

Court grants defendants' motion, thereby dismissing the Complaint in its entirety.

## BACKGROUND

The following recitation of facts is drawn entirely from the complaint, except

where otherwise indicated.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :
IN RE FOREST LABORATORIES, INC.  :        05 cv. 3489 (RJH)
DERIVATIVE LITIGATION                    :
                                                :        **MEMORANDUM OPINION**
                                                :        **AND ORDER**
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Plaintiffs Jeff Michelson and Eleanor Turberg, shareholders of Forest

Laboratories, Inc. ("Forest" or the "Company"), bring this derivative action on behalf of

Forest against its directors and officers alleging a breach of fiduciary duty arising out of

defendants' sale of the Company's stock while allegedly misleading shareholders as to

the future prospects of its key products, the antidepressants Celexa and Lexapro.

Plaintiffs bring additional counts alleging breach of fiduciary duty, abuse of control,

gross mismanagement, waste of corporate assets, and unjust enrichment.

Defendants now move to dismiss the Verified Consolidated Shareholder

Derivative Complaint (the "Complaint") pursuant to Rule 23.1 of the Federal Rules of

Civil Procedure for failure to assert well-pled allegations showing that demand upon the

Forest Board of Directors would have been futile. For the reasons set forth below, the

Court grants defendants' motion, thereby dismissing the Complaint in its entirety.

## BACKGROUND

The following recitation of facts is drawn entirely from the complaint, except

where otherwise indicated.

1. Defendants

    a. Forest Labs

Nominal defendant Forest is incorporated under Delaware law. (Compl. ¶ 23.)
Plaintiffs, shareholders of Forest, bring this suit on its behalf. (*Id.* ¶¶ 1, 15, 22.) Forest
and its subsidiaries develop, manufacture, and sell ethical drug products which require a
physician's prescription, as well as nonprescription pharmaceutical products for over-the-
counter sale. (*Id.* ¶ 23.)

    b. Inside Director Defendants

Of the seven directors on Forest's Board of Directors at the time this complaint
was filed, two are inside directors. Individual director Howard Solomon ("Solomon")
was Forest's Chief Executive Officer and Chairman of its Board (*id.* ¶ 24), and individual
defendant Kenneth E. Goodman ("Goodman") was Forest's President and Chief
Operating Officer, and a member of its board (*id.* ¶ 25) (collectively, the "Inside
Directors").

    c. Outside Director Defendants

The remaining five members of Forest's board are William J. Candee, III
("Candee"), George S. Cohan ("Cohan"), Daniel L. Goldwasser ("Goldwasser"), Lester
B. Salans ("Salans"), and Phillip M. Satow ("Satow") (collectively, the "Outside
Directors"). None of the Outside Directors serve as officers in the Company.

    d. Officer Defendants

Three defendants, John E. Eggers (*id.* ¶ 26), Elaine Hochberg (*id.* ¶ 27), and
Lawrence S. Olanoff (*id.* ¶ 33), are officers of Forest, but not members of Forest's Board

2

of Directors. Allegations concerning them will therefore not be relevant to determining demand futility.

## 2. Allegations of Wrongdoing

Plaintiffs' allegations of wrongdoing arise out of misrepresentations allegedly made (or allowed to be made) by defendants with respect to three lines of Forest pharmaceutical products, allegedly resulting in the artificial inflation of Forest's stock price underlying plaintiffs' breach of fiduciary and other claims.

### a. Antidepressants: Celexa and Lexapro

The first, and most significant, is Forest's antidepressant franchise, which consists of the selective serotonin reuptake inhibitors ("SSRIs") Celexa (citalopram HBr) and its successor Lexapro (escitalopram oxalate). (*See* Compl. ¶ 7.) Plaintiffs allege that Forest made misrepresentations regarding the efficacy of Celexa for use in treating pediatric depression while in possession of a study which contradicted those representations. (*Id.* ¶¶ 10–11, 13, 68–69, 74, 82, 111.)

To date, Celexa has only been approved for use in adults 18 years of age or older. (*Id.* ¶ 9.)[1] In 2001, Forest, in cooperation with its licensor, Lundbeck, funded a study on the use of Celexa in pediatric care. (*Id.* ¶ 67.) On December 13, 2001, Forest issued a

---

[1] In the United States, the regulations of the Food and Drug Administration (FDA) permit physicians to prescribe approved medications for other than their intended indications. This practice is known as off-label use. *See* Legal Status of Approved Labeling for Prescription Drugs; Prescribing for Uses Unapproved by the Food and Drug Administration, 37 Fed. Reg. 16,503, 16,503 (proposed Aug. 15, 1972) (final rule codified at 21 C.F.R. pt. 130) ("Once the new drug is in a local pharmacy . . . the physician may, as part of the practice of medicine, . . . vary the conditions of use from those approved in the package insert, without informing or obtaining the approval of the Food and Drug Administration."). A significant percentage of prescriptions in the United States are written for off-label indications. *See generally* Mitchell Oates, Note, *Facilitating Informed Medical Treatment Through Production and Disclosure of Research into Off-Label Uses of Pharmaceuticals*, 80 N.Y.U. L. Rev. 1272, 1274 (2005) (discussing off-label use).

press release "Results of Escitalopram and Celexa™ Studies Presented at Major Scientific Conference" which reported that the clinical study (the "Texas Study")[2] showed that "Celexa may significantly reduce depression in adolescents and children" and that the "study is significant because few studies involving any antidepressant have shown efficacy compared to placebo in the treatment of depression in children and adolescents." (*Id.* ¶ 69.) Early in 2002, following Forest's release of its positive fiscal third quarter results for 2001, the media attributed Forest's rise in profits to strong demand for Celexa, and reported that Forest hoped to leverage robust sales into developing Lexapro for depression and memantine for Alzheimer's. (*Id.* ¶¶ 70–71.) In May 2002, the Texas Study was presented at an American Psychiatric Association conference. (*Id.* ¶ 74.) Through late 2002, medical-industry publications also reported the results of the Texas Study, as well as an additional Forest-sponsored study conducted in South Africa, both of which demonstrated that Celexa was well tolerated and efficacious in treating pediatric depression. (*Id.* ¶¶ 77, 82.) On July 17, 2002, Forest announced that the FDA granted Forest a six-month extension on marketing exclusivity for Celexa based on its review of Forest's pediatric data,[3] extending the exclusivity period through January 2004. (*Id.* ¶ 75.) In addition to allowing Forest to receive an extension on market exclusivity, studies reflecting Celexa's efficacy in treating pediatric

---

[2] The study referred to here as the "Texas Study" is entitled "A Randomized Placebo-Controlled Trial of Citalopram [Celexa] for the Treatment of Major Depression in Children and Adolescents" and included eighty-three children aged 7 to 11 and ninety-one adolescents aged 12 to 17. (Compl. ¶ 74.) The Texas Study's lead author is Karen Dineen Wagner, MD, PhD, Department of Psychiatry and Behavioral Sciences, University of Texas Medical Branch at Galveston. (*Id.* ¶ 69.)

[3] Pursuant to the Best Pharmaceuticals for Children Act, Pub. L. No. 107-109, 115 Stat. 1408 (2002) (codified as amended in scattered sections of 21 U.S.C. and 42 U.S.C.), the FDA will grant a six-month pediatric extension on market exclusivity (PED) upon review of studies supporting use of an approved drug in pediatric populations.

depression also can result in off-label prescriptions, which, in turn, leads to an increase in revenues for Forest. (*Id.* at ¶¶ 8–9.)

Around the same time, on August 15, 2002, Forest announced that Lexapro[4] had received FDA approval for the treatment of major depressive disorder in adults, based on efficacy and safety data from clinical trials on patients between the ages of 18 and 65 with moderate-to-severe depression. (*Id.* ¶ 76.) Forest commenced, and continued throughout 2003, a campaign to convert Celexa patients to Lexapro prior to the emergence of generic competition (expected in January 2004 absent FDA approval for label expansion). (*Id.* ¶¶ 79, 81.) This campaign to promote Lexapro relied on the emergence of new and favorable comparative clinical data (against Celexa and other antidepressants on the market, in particular Pfizer's Zoloft). (*Id.* ¶¶ 83, 85, 91, 93–94, 96–99, 131.) In April 2003, Forest reported significant earnings for the fourth quarter 2002, and attributed growth to the continued success of Celexa and Lexapro, and predicted continued growth. (*Id.* ¶ 84.) Plaintiffs allege that the foregoing positive announcements regarding Forest resulted in a continued rise in its stock price between July 11, 2002 and June 17, 2003, and that defendants "bailed out" by selling a significant amount of their holdings of Forest stock during this time period. (*Id.* ¶¶ 86–87.)

On July 15, 2003, Forest announced increased earnings for the first quarter 2003, and noted that Celexa and Lexapro achieved the leading antidepressant market share for new and total prescriptions, and that Lexapro's market-share increase more than offset Celexa's share decline. (*Id.* ¶ 88.) Forest also warned that slower market growth in the pharmaceutical industry generally, including the SSRI category, could impact its bility to

---

[4] Celexa contains both enantiomers of citalopram, while Lexapro consists of only the active S-enantiomer.

achieve growth targets in 2003, and slower market growth would be responded to by reviewing discretionary spending for the remainder of the year. (*Id.*) This resulted in a 9.4 percent drop in Forest's shares. (*Id.* ¶ 89.)

Plaintiffs directly attribute a fall in stock prices during the summer of 2003 to a general slowing of SSRI prescriptions, but also simultaneously attempt to raise an inference that it was related to Forest's alleged concealment of a study conducted in Europe from 1996 to 2002—sponsored by Forest's European-based licensor H. Lundbeck—with negative results "which showed Celexa/Lexapro did not work on depressed children/adolescents *and* caused increased suicidal tendencies" (the "Danish Study"). (Compl. ¶ 90 (emphasis in original); *see also id.* ¶ 111.) There is no indication when the results were published; however, based on the allegations in the Complaint, the Danish Study did not come into the public eye until April 2004. (*Id.* ¶ 108.)

In August 2003, Pfizer announced that Zoloft was effective with children without increasing suicidal tendencies, and that it was seeking permission from the FDA to include this safety information on its label. (*Id.* ¶ 92.) This received widespread publicity, and an August 27, 2003 *Wall Street Journal* article reported especial interest in the Zoloft research in light of "recent concerns that [antidepressants] could increase the suicide risk for kids." (*Id.*) Although the Complaint does not identify when clinical trials revealing the potential suicide risk associated with the use of SSRIs first appeared publicly, a reasonable inference arising out of this allegation is that concerns had been publicized at least by mid-2003.

On February 2, 2004, an FDA panel held hearings on the connection between SSRIs and suicidality. (*Id.* ¶ 103.) According to a *New York Times* article reporting on

6

the hearings, a scientific advisory panel urged the FDA to issue immediately stronger warnings about possible risks to children, rather than waiting for the completion of agency review of the risks. (*Id.*) On March 22, 2004, the FDA issued a health advisory warning regarding SSRI drugs. (*Id.* ¶ 105.) According to a *New York Times* article reporting the warning, regulators warned physicians to watch patients closely for heightened suicide risk when first giving antidepressants.[5] (*Id.*) Celexa and Lexapro were listed among the antidepressants included in the warnings. (*Id.*) On March 23, 2004, H. Lundbeck, Forest's licensor, announced that for years it had included a warning that patients using its antidepressants should be monitored for suicide risk in Denmark, and further noting that until now there has been no warning with Lundbeck's antidepressants sold on the American market by Forest. (*Id.* ¶ 106.) On April 23, 2004, *Bloomberg*[6] reported that, according to two unpublished trials involving 422 children, Celexa did not reduce depression symptoms enough to show a benefit and raised the risk of suicide attempts and other side effects. (*Id.*) On June 21, 2004, the *New York Times* reported that the Danish Study, conducted and sponsored by Lundbeck, found that Celexa did not help depressed adolescents more than a placebo. (*Id.* ¶ 111.) Spokesmen for Lundbeck said the results were reported to Forest, but could not say when. (*Id.*) On June

---

[5] This article, dated February 3, 2004, does not differentiate between pediatric and adult use of antidepressants. Furthermore, the article reported that "agency officials said that no studies had shown a convincing link between drug therapy and suicide. Suicide is such a rare side effect that studies on the subject have been difficult to interpret." The article also reported "[a] series of secret studies, which were conducted by drug companies and became public last year, seemed to show that depressed children and teenagers given antidepressants were more likely to become suicidal than those given placebos. The studies also showed that most antidepressants were not effective in treating depression in children and teenagers." Erica Goode, *Stronger Warning Is Urged on Antidepressants for Teenagers*, N.Y. Times, Feb. 3, 2004, *available at* http://query. nytimes.com/gst/fullpage.html?sec=health&res=9C0DE5DC143BF930A35751C0A9629C8B63.
[6] Available at http://quote.bloomberg.com/apps/news?pid=10000102&sid=a8h8HJmH58V8& refer=uk#.

7

24, 2004, Forest announced that a recent clinical trial of Lexapro did not achieve statistically significant efficacy in the treatment of pediatric depression (*id.* ¶ 116.), which was closely followed by a fall in its stock prices (*id.* ¶ 117). On October 15, 2004, the FDA directed manufacturers to include a "black box" warning on SSRIs regarding the potential increased risk of suicide. (*Id.* ¶¶ 127–28.)

Plaintiffs further allege that defendants failed to disclose that Forest's successor drug, Lexapro, was not sufficiently superior to or more efficacious than Celexa in treating depression in adults, at least not to the extent necessary to justify the significant price disparity. (*Id.* ¶ 170(b)). Worth noting here is that the Complaint is devoid of any allegations, conclusory or otherwise, that there was some revelation of Lexapro's lack of superiority resulting in negative publicity and/or a drop in share price. In fact, beyond innuendo, the Complaint contains no direct allegations, conclusory or otherwise, that Lexapro is *not* in fact better than Celexa, or that evidence to that effect exists. With a similar lack of detail, plaintiffs allege that Forest "unlawfully" promoted Celexa for "off-label use. Exactly how the unlawful promotion occurred, or more pertinent, what misleading statements or omissions were made, is left unstated. (*See* Compl. ¶¶ 101–02, 118–21, 122–23, 125, 130.)

### b. Alzheimer's Disease Treatment: Namenda

The second drug at issue in plaintiff's Complaint is Namenda (memantine HCl), for which Forest has FDA approval for moderate-to-severe Alzheimer's disease. (*Id.* ¶ 144.) Plaintiffs allege that defendants made representations regarding Namenda's efficacy for patients suffering from mild-to-moderate Alzheimer's disease in order to encourage off-label prescriptions (*id.* ¶¶ 145, 152–53, 155), and publicized possible label

8

expansion by mid-2004 on the basis of positive studies indicating the drug's efficacy of Namenda for mild-to-moderate Alzheimer's disease, which did not come to fruition (*id.* ¶¶ 145, 153, 155, 159). Absent from the Complaint are any allegations that the positive studies regarding Namenda's efficacy for mild-to-moderate Alzheimer's were inaccurate, or that negative studies were undisclosed. (*See id.* ¶¶ 135–38.)

c. Fibromyalgia Syndrome Pain Treatment: Milnacipran

The third drug is milnacipran, a drug that Forest announced in January 2004 it intended to develop for use in the treatment of Fibromyalgia Syndrome ("FMS"). (*Id.* ¶ 161.) At the time of the announcement, Forest had entered into an agreement with the drug's developer and originator, and the drug had shown statistically significant improvements for FMS patients in "Phase II" testing, and was about to undergo "Phase III" clinical trials to support its registration for the treatment of FMS in the United States. (*Id.*) In September 2005, however, Forest released a press statement announcing that an initial Phase III study did not achieve statistical significance. (*Id.* ¶ 164.) Plaintiffs allege that the resulting drop in the stock's price was the result of prior false statements by defendants (*id.* ¶ 165) but do not identify any statements by Forest regarding milnacipran as false.

d. Allegations Arising Out of Wrongdoing

Based on the foregoing, two related litigations were filed in this district. The first set of cases is a putative class action brought against Forest, and Messrs. Solomon, Goodman, Eggers, Hochberg, Olanoff, (all named in the instant complaint); and certain senior officers of the company, including Mary E. Prehn, Forest's Vice President of Licensing and Corporate Development, Raymond Stafford, Forest's Executive Vice

9

President for Global Marketing, and Charles E. Triano, Forest's Vice President for Investor Relations (collectively, the "Securities Defendants"), asserting that the alleged misstatements and omissions relating to Celexa, Lexapro, Namenda and Milnacipran violated the federal securities laws. These cases have been consolidated and are currently pending before the Hon. Richard M. Berman under the caption *In re Forest Laboratories Securities Litigation*, 05 Civ. 2827 (RMB). By Order dated July 19, 2006, Judge Berman granted in part and denied in part the Securities Defendants' Motion to Dismiss pursuant to Rule 12(b)(6).[7] The instant derivative complaint, based on state corporate law, alleges that defendants have breached their fiduciary duties to the corporation under Delaware law by (1) selling shares of Forest stock with knowledge of material adverse nonpublic information affecting Forest's financial condition and future business prospects (*id.* ¶¶ 179–82); (2) knowingly causing Forest to misrepresent its financial results and failing to correct the Company's publicly reported financial results (*id.* ¶ 186); and (3) abandoning and abdicating their responsibilities and fiduciary duties to prudently manage the assets and business of Forest (*id.* ¶ 195). Based on the same alleged wrongdoing, plaintiffs also bring claims for abuse of control (*id.* ¶ 190), corporate waste (*id.* ¶ 200), and unjust enrichment (*id.* ¶ 204).

On the present motion, defendants do not contest, and this Court does not address, the legal sufficiency of the breach of fiduciary claims asserted against them derivatively on behalf of the corporation. Rather, defendants challenge plaintiffs' failure in the first

---

[7] Specifically, Judge Berman held that the securities complaint "properly pleaded claims with respect to Forest's alleged failure to disclose studies about the safety and efficacy of Celexa and Lexapro as well as the improper off-label promotion of those drugs to children and adolescents," but dismissed the "claims relating to alleged improper characterizations of Lexapro as different from Celexa and the timing of a potential Namenda approval application" without prejudice. (July 19, 2006 Order at 22–23.)

instance to make a demand on the Board of Directors to bring the action directly in the name of the corporation. Accordingly, the Court addresses this procedural issue only.

### 3. Plaintiffs' Demand-Futility Allegations

Plaintiffs concede that they did not make any demand on the Board to institute this action, and allege that such a demand would have been futile. (*Id.* ¶ 175.) First, plaintiffs proffer that demand would have been futile because while in possession of adverse nonpublic information regarding "improper accounting,"[8] each of the directors made illegal insider sales of their Forest stock. (*Id.* ¶ 175(a).)[9]

Plaintiffs also claim that demand was futile because each Outside Director was a member of one or more Board Committees. (*Id.* ¶¶ 175(b), (e).) Plaintiffs claim that the members of Forest's Compensation Committee—Outside Directors Candee, Cohan, Goldwasser and Salans—"improper[ly] execut[ed] . . . their duties and responsibilities" by not "ensuring that Forest officers and directors would not be unduly compensated for engaging in activities harmful to the Company." (*Id.* ¶ 175(b).) Further, plaintiffs allege that the Compensation Committee members are "interested by their self-dealing in rewarding themselves underserved [sic] compensation." (*Id.*) No allegations are made indicating what compensation these, or any, directors received. Plaintiffs additionally claim that the members of Forest's Audit Committee—Outside Directors Candee,

---

[8] The Court assumes that this allegation is a typographical error, as there are no allegations of improper accounting in the complaint. It appears that the adverse nonpublic information intended to be referenced here, relates primarily to trials, such as the Danish Study, indicating that Celexa was ineffective in treating pediatric depression or increased suicidal tendencies.

[9] Inside officer director Solomon sold 5,608,900 shares for proceeds of $328,302,846.70 and Goldman sold 500,000 shares for proceeds of $24,786,000. (Compl. ¶¶ 171, 175(a).) The outside directors made the following sales during the relevant period: Salans, 77,200 shares for $4,556,724.50; Cohan, 55,000 shares for $4,350,000.00; Satow, 40,000 shares for $2,154,994.30; Goldwasser, 22,700 shares for $1,525,273; and Candee, 27,000 shares for $1,463,144.50. (*Id.* ¶¶ 171, 175(a).)

11

Goldwasser and Satow—"recommended that the Board include false and improper statements" in the Company's Form 10-Ks filed with the SEC, and "[b]y such actions . . . breached their duties by causing or allowing . . . improper financials . . . ." (*Id.* ¶ 175(e).) The Complaint does not, however, otherwise allege that improper financial statements or SEC filings were made.

Finally, plaintiffs claim that the Outside Directors "participated" in wrongdoing by "fail[ing] to prevent and correct the improper statements." (*Id.* ¶ 175(f).) Plaintiffs also assert that, because the Outside Directors had "access to internal corporate documents," had "conversations and connections" with Forest officers and employees, and "attend[ed] . . . Board meetings and committees thereof" at which "reports and other information" were provided, each Outside Director "knew of or recklessly disregarded" the unlawful practices alleged in the Complaint. (*See id.* ¶¶ 28–32, 39, 40, 45, 50.) Specific allegations identifying internal corporate documents, board meeting minutes containing "conversations and connections" and verifying the provision of "reports and other information" do not appear in the Complaint.

## DISCUSSION

### 1. Applicable Legal Standards

Plaintiffs' claims are brought in derivative form on behalf of Forest, of which plaintiffs are shareholders. When shareholders bring "a derivative suit on behalf of the corporation against the directors based on their actions or failure to act, there is a threshold question of standing as to whether the shareholders have made a demand on the board of directors." *Fink v. Weill*, 02 Civ. 10250 (LTS), 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005) (citing Fed. R. Civ. P. 23.1). The Federal Rules of Civil

Procedure impose heightened pleading requirements for shareholder derivative suits,

including that:

> [t]he complaint shall . . . allege with particularity the efforts, if any, made
> by the plaintiff to obtain the action the plaintiff desires from the directors
> or comparable authority and, if necessary, from the shareholders or
> members, and the reasons for the plaintiff's failure to obtain the action or
> for not making the effort.

Fed. R. Civ. P. 23.1. Because Rule 23.1 requires particularized allegations, the pleading

standard is higher than the standard applicable to a pleading subject to a motion to

dismiss pursuant to Rule 12(b)(6). *Fink*, 2005 WL 2298224, at \*3 (citing *In re Trump*

*Hotels S'holder Derivative Litig.*, 96 Civ. 7820 (DAB), 96 Civ. 8527 (DAB), 2000 WL

1371317, at \*6 (S.D.N.Y. Sept. 21, 2000)); *see also Halpert Enters., Inc. v. Harrison*,

362 F. Supp. 2d 426, 429 (S.D.N.Y. 2005) (quoting *Burghart v. Landau*, 821 F. Supp.

173, 179 (S.D.N.Y. 1993)) (stating that demand shall be excused "'only if the

complaining stockholder, in his complaint, makes well pleaded allegations that demand

on the corporation is futile.'"). When considering a motion to dismiss for failure to

satisfy Rule 23.1's particularity requirement, the Court accepts as true all well-pleaded

allegations and all reasonable inferences drawn therefrom. *Halpert*, 362 F. Supp. 2d at

430 (citing *Levner v. Saud*, 903 F. Supp. 452, 456 (S.D.N.Y. 1994)).

The demand requirements for a derivative suit are determined by the law of the

state of incorporation. *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991). The

parties agree that Delaware law applies here. Under Delaware law the decision to bring a

lawsuit on behalf of a corporation is ordinarily at the discretion of its board of directors.

*See* Del. Code Ann. Tit. 8 § 141(a). As noted, plaintiffs concede that no demand was

made on the Forest Board of Directors. (Compl. ¶ 175.) Demand may be excused as

13

futile, however, "where a reasonable doubt exists that the board has the ability to exercise its managerial power, in relation to the decision to prosecute, within the strictures of its fiduciary obligations." *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992). Where, as here, plaintiffs do not challenge a particular business decision made by the board as a whole, the Court applies the test for demand futility as set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). *See also Guttman v. Huang*, 823 A.2d 492, 299 (Del. Ch. 2003) (applying *Rales* test where plaintiffs alleged, *inter alia*, that the defendant-directors individually breached their fiduciary duties by purposely trading in their individual capacities while in possession of material, adverse, and nonpublic information); *Fink*, 2005 WL 2298224, at *3 (applying *Rales* test where plaintiff accuses directors of failure to act). Under the *Rales* test, a plaintiff must provide particularized allegations that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. A director is considered "interested" where the director is in a position to receive a personal financial benefit from a transaction that would not be equally shared by the corporation or shareholders, or where a transaction would be materially detrimental to the director but not to the corporation or shareholders. *Id.* at 936. Where the potential personal liability for an individual director is not just "a mere threat" but rises to "a substantial likelihood," that risk of liability can support a finding that a director is interested. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984)).[10] In order to establish a director's lack of

---

[10] While it has been frequently argued, including by plaintiffs in this action, that the members of a board of directors are inherently "interested" when asked to sue themselves, Delaware courts have roundly rejected the proposition that reasonable doubt as to interestedness is established

14

"independence," plaintiffs must show that the directors are "beholden" to interested directors or officers, "or so under their influence that their discretion would be sterilized." *Id.* (citing *Aronson*, 473 A.2d at 815).

At the time plaintiffs filed the complaint in this action, Forest's Board of Directors consisted of the following seven directors: defendants Solomon, Goodman, Candee, Cohan, Goldwasser, Salans, and Satow. (Compl. ¶ 175.) In order to establish the futility of demand, plaintiffs must show that a reasonable doubt exists as to the disinterest or independence of at least four of the seven directors. The Court assumes, for purposes of this motion only, that Inside Directors Solomon and Goodman are interested and will focus its inquiry on the alleged interestedness of the remaining five Outside Directors.[11]

## 2. Plaintiffs Have Not Established the Board's Substantial Risk of Liability for Insider Trading

Plaintiffs allege that demand is excused as futile because each member of the Board of Directors made sales of Forest shares while in possession of material, adverse, and nonpublic information regarding the Company during the relevant period, thereby receiving "a personal financial benefit from the challenged insider trading transactions . . . [which renders them] interested and any demand upon them . . . futile." (Compl. ¶ 175(a)(vii).) In their brief, plaintiffs further argue that the complaint alleges facts raising a substantial likelihood of directorial liability for insider sales, rendering the trading directors interested and incapable of fairly entertaining a demand for suit. (Pls.' Opp'n Mem. 11–15.)

---

simply by positing that the directors would have to sue themselves. *See, e.g.*, *Brehm v. Eisner*, 746 A.2d 244, 257 n.34 (Del. 2000).

[11] Plaintiffs make no challenge to the independence of the Outside Directors.

In the context of the demand-futility inquiry, the issue is whether the trading directors could disinterestedly consider a demand by shareholders to pursue, on behalf of the corporation, a claim charging them with insider trading on the basis of their trades. *See Zimmerman v. Braddock*, C.A. No. 18473-NC, 2005 Del. Ch. LEXIS 135, *35–*36 (Del. Ch. Sept. 8, 2005). As discussed above, particularized allegations which, if true, give rise to a "substantial likelihood" of personal liability are necessary to raise a reasonable doubt with respect to a director's disinterestedness. *Rales*, 634 A.2d at 936. Cursory allegations that a director made sales of company stock in the market at a time when he possessed material, nonpublic information are not sufficient to find a director interested for demand-futility purposes. *See Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) (noting that corporate insiders sell company stock as a matter of course, and that such sales "are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table"); *see also Zimmerman*, 2005 Del. Ch. LEXIS 135, at *30 (quoting *Guttman*) (finding demand futility excused where the plaintiff has "gone beyond mere cursory allegations of insider trading"). Instead, a "balanced approach" to demand futility analysis requires focusing "on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." *Guttman*, 823 A.2d at 502 (emphasis added); *see also Zimmerman*, 2005 Del. Ch. LEXIS 135, at *32 & nn.80–81 (emphasis added) (finding demand futility excused where plaintiffs'

16

allegations raised a reasonable inference that the "Selling Defendants had knowledge—directly and by imputation—of [the companies'] problems").

### a. Plaintiffs Have Not Alleged with Particularity that the Outside Directors Had Direct Knowledge of Inside Information

The complaint contains no particularized allegations that, if true, would establish that any of the five Outside Directors were in possession of adverse nonpublic information regarding Celexa, including, specifically, the negative Danish Study, that would have alerted the board to the risk that pediatric use would not be approved. In fact, an examination of the paragraphs cited in purported support of the proposition that plaintiffs have alleged precisely how each director came into possession of such information belies this claim. (Pls.' Opp'n Mem. 14 (citing Compl. ¶¶ 24, 25, 41, 46, 171, 175).) Paragraphs 24 and 25 relate solely to inside directors Solomon and Goodman, whose independence, for purposes of this motion, is not at issue. Paragraphs 41 and 46 simply identify the members of the Compensation Committee (Cohan, Candee, Goldwasser, and Salans) and the Nominating and Corporate Governance Committee (same), respectively. Paragraph 171 lists each defendant's sales of shares during the relevant period. And finally, paragraph 175 contains plaintiffs' generalized futility allegations including: broad statements that defendants were in possession of material adverse nonpublic information regarding "improper accounting" (which is not even at issue in this action) (Compl. ¶ 175(a)); conclusory statements that the directors of Forest "participated in, approved, and or permitted the wrongs alleged" in the Complaint (*id.* ¶ 175(h)), without particularized allegations tending to establish that the Outside Directors had knowledge of any alleged misrepresentations, and conclusory statements that the Outside Directors "authorized and/or permitted" false statements to be

17

disseminated (*id.* ¶ 175(k)), again without any particularized allegations establishing what false statements were authorized by the Outside Directors or tending to show that the Outside Directors had knowledge of the alleged falsity of such representations.

While the Court is required to draw all reasonable inferences from well-pled allegations demonstrating demand futility, the Complaint provides very few allegations from which any inferences of the Outside Directors' knowledge may be reasonably drawn. The Complaint does not identify any types of reports, studies, or analyses made available to the Board, or board meeting minutes reflecting conversations from which the Court may infer that the Outside Directors had actual knowledge of the Danish Study or any other alleged inside information. *Compare Guttman*, 823 A.2d at 503 ("Entirely absent from the complaint are well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting regularities."), *Rattner v. Bidzos*, Civ. A. 19700, 2003 WL 22284323, at *10 (Del. Ch. Oct. 7, 2003) (unpublished opinion) ("[Plaintiff] merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in ) the allegedly material misstatements."), *Fink v. Komansky*, 2004 WL 2813166, at *6 (S.D.N.Y. Dec. 8, 2004) (applying Delaware law) (finding that plaintiffs had not established that directors were interested as a result of their alleged insider trading where "[p]laintiff asserts that their membership on the Board and their positions at executive levels of Merrill Lynch provided O'Neal and Peters with adverse, non-public information. But, plaintiff does not state what exactly was that information."), *with Zimmerman*, 2005 Del. Ch. LEXIS 135,

18

at *32 nn.80–81 (finding that a reasonable inference of knowledge underlying director trades was raised where complaint included (1) particularized allegations that the trading directors made specific statements acknowledging concerns about the very problems at issue in the alleged false statements; and (2) identified the precise types of reports specifically relevant to these problems to which defendants had access).

> b. Plaintiffs Have Not Alleged with Particularity Facts Giving Rise to an Inference that the Outside Directors Had Constructive Knowledge of Inside Information

Plaintiffs argue, as an alternative or additional basis to finding the Outside Directors interested for purposes of demand futility, that because the complaint alleges material misrepresentations regarding Celexa and Lexapro, which account for up to eighty-two percent of Forest's sales, knowledge of those misrepresentations may be attributed to the Outside Directors. (*See* Pls.' Opp'n Mem. 14–15.) While it is true that (in the securities fraud context) knowledge of facts critical to the continued viability of major transactions or "core" business operations have been imputed to a company and its "key" or "top" officers, *see In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1076 (N.D. Cal. 2002) ("[W]here major transactions or core information is at issue, an inference arises that top officers of a company were aware of the transaction or information."); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (D. Wash. 1998) ("[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers."), there is no authority to support the attribution of knowledge to Outside Directors who are not alleged to be directly involved in the day-to-day operations of the company.[12]

---

[12] It is perhaps unsurprising, then, that none of the Outside Directors are named as defendants in the related securities class action complaint. It is worth noting here that Judge Berman's recent

Furthermore, the cases charging top officers with knowledge of negative information by reason of their status—keeping in mind that a top officer clearly has more direct access to information than an outside director—typically "involved circumstances far more suggestive of their direct access to such information." *In re Keyspan Corp. Secs. Litig.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003); *see also, e.g., In re Tel-Save Sec. Litig.*, 98 Civ. 3145, 1999 WL 999427, at \*5 (E.D. Pa. Oct. 19, 1999) (attributing to CEO/director-defendant knowledge of misstatements made in connection with major transactions, some of which defendant was alleged to have negotiated single-handedly); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (attributing knowledge of misstatements concerning merger valued at \$8.9 million to defendants occupying the "top corporate positions" based on the size of the transaction combined with the positions held by the defendants and the degree of the operational problems alleged); *In re Ancor Commc'ns, Inc., Sec. Litig.*, 22 F. Supp. 2d 999, 1004 (D. Minn.1998) (charging individual defendants—President/CEO/Director, Vice President/CFO, and co-founder/Chairman of the Board of Directors—with knowledge of fundamental problems regarding "undeniably the most significant contract in [the company's] history").

In *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989), the only binding authority cited by plaintiffs that imputes knowledge to an entire board of directors, the Second

---

decision in the securities action held that the alleged misleading statements at issue in the class action complaint were properly attributed to the senior officers/defendants because they were "alleged to have had *direct involvement in Forest's every day business*." (July 19, 2006 Order at 14 (emphasis added).) As noted, such allegations with respect to the Outside Directors are conspicuously absentfrom the derivative complaint. Judge Berman also held that the class action plaintiffs had adequately alleged knowledge/scienter with respect to Forest's senior officers because knowledge of Celexa and Lexapro goes to Forest's "core business operations." (*Id.* at 16.) As in every other case cited by plaintiffs in support of their constructive knowledge argument, however, this knowledge is imputed only to the high level officers named in the securities class action, whose direct involvement in the every day operations of the Company provides a well-pled basis for the imputation of knowledge.

Circuit found that, for purposes of satisfying Federal Rule of Civil Procedure 9(b), a

strong inference of scienter was raised that the board of directors had knowledge of

import restrictions that eliminated a "significant source of income for the company."

Assuming, for purposes of discussion, that Rule 9(b)'s heightened pleading standard is

equivalent, or at least analogous, to that of Rule 23.1 in this context, the significance of

the information at issue in *Cosmas* is readily distinguishable from the information at issue

here. In *Cosmas*, the Chinese government had implemented import restrictions which

eliminated a large portion of the defendant corporation's projected future sales, while at

the same time the corporation issued statements emphasizing the importance of its sales

to China to its future profitability. *Cosmas*, 886 F.2d at 10–12.

Similarly, in *In re Biopure Corp. Derivative Litig.*, 424 F. Supp. 2d 305 (D. Mass.

2006), defendants moved to dismiss a derivative shareholder complaint on the grounds

that plaintiffs had not adequately pleaded insider-trading claims or alleged "interest" for

demand-futility purposes. For both these purposes, the court had to determine whether

plaintiffs adequately alleged that the defendants (officers and directors of a

pharmaceutical company) had knowledge of an FDA clinical hold[13] on Hemopure, the

---

[13] A prerequisite to an NDA (New Drug Application) for FDA approval of a drug for some specified use is clinical trials on human subjects to determine the drug's safety and efficacy for its intended use. IND (Investigational New Drug) applications are submitted to the FDA by a sponsor (the organization proposing to conduct clinical trials) and provide the FDA with the information necessary to evaluate whether the drug can be tested on human subjects. "At any time in the clinical trials process, the FDA is allowed to issue a 'clinical hold' if it is deemed necessary. A clinical hold is an order issued by the FDA to the sponsor to delay a proposed investigation or to suspend an ongoing investigation entirely. When a clinical hold is issued, no new subjects are allowed to enter the program, and patients already in the study must be taken off the drug unless discontinuing the treatment could interfere with patient safety. Within seven days from issuance of a clinical hold, the FDA is required to send a letter to the sponsor outlining the perceived deficiency in the trial. The FDA must respond to the sponsor's response to its letter within thirty days. Unless an unfavorable response from the FDA is given, after thirty days, the trial is allowed to continue. Grounds for Phase I clinical holds include unreasonable risk to human subjects, unqualified clinical investigators, and misleading or insufficiently supplied

21

company's principal product. *Id.* at 307–08. In holding that the plaintiffs were entitled to rely on an inference that the defendant officers and directors had knowledge of the clinical hold at the motion to dismiss stage, the district court noted that courts have been willing to impute to a company's officers and directors knowledge of information putting "a company's primary product or service . . . in *jeopardy*." *Id.* at 308 (emphasis added). A clinical hold on a drug could result in the failure of the drug to ever get FDA approval and reach the market—a catastrophic result for a pharmaceutical company's primary drug.

By contrast, in this case, while off-label sales and potential label expansion for pediatric use of Celexa and/or Lexapro are certainly not unimportant considerations for Forest, there are simply no allegations establishing that either off-label sales or label expansion for pediatric use was of such critical importance to Celexa and Lexapro's continued viability that all information relating to such sales or efforts ought to be reasonably imputed to Outside Directors. Indeed, entirely absent from the Complaint are allegations that questions regarding the efficacy of SSRI antidepressants for pediatric use has had any impact on the actual sales of Celexa or Lexapro. In addition, while alleged misrepresentations do include statements regarding Celexa's safety and efficacy in treating adolescent depression (*see* Compl. ¶¶ 68–69, 74, 77), unlike in *Cosmas*, the company did not make statements expressly tying its future profitability to expanded use. Furthermore, there are no allegations that Forest's failure to achieve label expansion for

---

information. Phase II and III holds can be called for any of the above, as well as for a determination that the protocols are deficient in design for achieving their stated objectives." http://pubs.acs.org/
subscribe/journals/mdd/v03/i08/html/10clinical.html; *see also* U.S Food & Drug Admin., Center for Drug Evaluation and Research, *Investigational New Drug (IND) Application Process, at* http://www.fda.gov/cder/regulatory/applications/ind_page_1.htm#Introduction.

Celexa or Lexapro has had, or was thought likely to have, catastrophic consequences for Forest's primary sources of revenue or put the "company's primary product . . . in jeopardy." *Biopure*, 424 F. Supp. 2d at 308; *see also In re Keyspan*, 383 F. Supp. 2d at 387–88 (emphasis added) ("[A]lthough the court might charge *senior KeySpan officials* with knowledge of a major contract dispute with the Company's largest customer, say, the problems at [the company KeysSpan acquired] are simply not of such a magnitude as to excuse plaintiffs from the usual rule requiring specificity"); *Epstein*, 993 F. Supp. at 1325–26 (imputing knowledge "that [the company]'s core product is technologically incapable of meeting requirements that are *central to* [*its*] *continued survival as a business entity*" only to "*key officers*") (emphasis added). Although Celexa and Lexapro do comprise an overwhelming majority of Forest's business, it cannot follow that every fact pertaining to those drugs may reasonably be imputed to Outside Directors, especially in light of the glaring absence of any particularized allegations that either (1) the ramifications of any nonpublic pediatric study were of such a magnitude that every outside director ought reasonably have had knowledge of it, or (2) the Board of Directors generally discussed these specific issues or had access to the types of documents that would give rise to a reasonable inference that they had knowledge of any such study. This case, then, falls outside the scope of constructive knowledge cases upon which plaintiffs rely.

Plaintiffs' pleading deficiencies are especially troubling in light of the "repeated admonitions of the Delaware Supreme Court and [Chancery Court] for derivative plaintiffs to proceed deliberately and to use the books and records [inspection provision

under Delaware law] to gather the materials necessary to prepare a solid complaint."
*Guttman*, 823 A.2d at 504.

Section 220 of the Delaware General Corporation Law allows a shareholder to
inspect a corporation's books and records upon demand. A stockholder seeking
inspection of books and records must (1) be a stockholder of record; (2) comply with the
form and manner requirements when making the demand; and (3) state a proper purpose
for the requested inspection. A "proper purpose" is defined by § 220(b) as one
"reasonably related to such person's interest as a stockholder." Del. Code Ann. Tit. 8 §
220(b). While "actual wrongdoing itself need not be proved in a section 220
proceeding," a plaintiff must establish "a credible basis to find probable wrongdoing on
the part of corporate mismanagement" by a preponderance of the evidence. *Sec. First
Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997). Inspection of
corporate books and records under section 220 contemplates the review of all board
meeting minutes. *See Beam v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004); *Beam v.
Stewart*, 833 A.2d 961, 981–82 nn.65–66 (Del. Ch. 2003) (citing authority in Delaware
Chancery and Supreme Courts admonishing plaintiffs bringing derivative suits to employ
section 220 in order to adequately plead demand futility); *Haywood v. Ambase Corp.*,
Div. A. 342-N, 2005 WL 2130614, at *7 (Del. Ch. Aug. 22, 2005) (unpublished opinion)
(allowing general access to all minutes and noting that "[I]t is clear that [defendants] may
not limit [plaintiff]'s inspection of its minutes to only those portions specifically
addressing the [alleged probable wrongdoings]. Instead, [plaintiff] is entitled to broad
access to the minutes in order to evaluate whether [defendant's] directors, through their
conduct as revealed in those minutes, have satisfied their fiduciary duties.") (citation

omitted). It is also common for such shareholder requests to include demands for all financial records relating compensation paid to directors, specific data pertaining to the company's manufacturing, operations, product lines, and industry. *See, e.g., Marathon Partners, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at \*2–\*3 (Del. Ch. July 30, 2004); *Ostrow v. Bonney Forge Corp.*, 1994 WL 114807, at \*5 n.9 (Del. Ch. Apr. 6, 1994).

Here, as in *Guttman*, the books and records made available through section 220 "could have provided the basis for the pleading of particularized facts—*i.e.*, for the filing of a complaint that meets the legally required standard. . . . [Plaintiffs] have thus ignored the repeated admonitions of the Delaware Supreme Court and [Chancery Court] to proceed deliberately and to use the books and records device to gather the materials necessary to prepare a solid complaint." *Guttman*, 823 A.2d at 504; *see also In re Citigroup Inc. S'Holders Litig.*, 2003 WL 21384599, at \*1 (Del. Ch. June 5, 2003) ("For some years this court and the Delaware Supreme Court have been urging would-be derivative plaintiffs to use the 'tools at hand' before filing complaints. The purpose of such a presuit investigation is to enable those persons to draw complaints that satisfy Rule 23.1's requirement that facts be alleged 'with particularity' justifying demand excusal.") (citing *White v. Panic*, 793 A.2d 356, 364–65 (Del. Ch. 2000); *Rales*, 634 A.2d 927, 934–35 n.10 (Del. 1993)).

### c. Plaintiffs Have Not Alleged with Particularity Facts Relating to the Outside Directors' Timing and Amount of Insider Sales that Give Rise to an Inference of Liability

Though plaintiffs do not press this point, the Complaint in this action also fails to raise an inference of insider trading liability based on timing and amount of the Outside

25

Directors' sales of Forest stock. There is no readily apparent connection to be drawn
from the five Outside Directors' widely disparate trading activity, the alleged misleading
statements disseminated by Forest, the "correction" of those alleged misstatements in the
market, and the dates identified in the Complaint as the relevant high and low trading
periods. In fact, the two single largest sales by Outside Directors occurred very shortly
after, according to plaintiffs, Forest's stock plummeted as a result of revelations in the
press regarding increased rates of suicidality among adolescents using antidepressant
medications. (*See* Compl. ¶¶ 104, 171; Pls.' Opp'n Mem. 4–5 (attributing price drop in
around February 2004 to adverse publicity of January 29, 2004 and February 2, 2004 and
showing that on February 10, 2004 Salans sold shares for proceeds of $1,875,750 and
that on March 5, 2004 Cohan sold shares for proceeds of $3,850,000).) Furthermore, the
Complaint does not make any allegations identifying (1) the Outside Directors total
individual holdings from which to conclude the any of the trades were "material"; (2)
their previous sales patterns, against which one might compare the volume of their sales
during the relevant period; (3) whether the directors received cash compensation or
simply shares; or (4) any other facts that would support an inference that the trades were
made on the basis of insider knowledge, and not ordinary sales typical "[a]s a matter of
course." *Guttman*, 823 A.2d at 502; *see also id.* at 503–04 ("In the absence of any fact
pleading that supports a rational inference that any of these directors had some basis to
believe that [the company]'s financial statements were materially misleading in a manner
that inflated the company's stock price, the mere fact that two of the directors sold large
portions of their stock does not, in my view, support the conclusion that those two
directors faced a real threat of liability."); *In re Pozen S'holders Litig.*, 2005 WL

26

3035783, at *9 n.1 (N.C. Super. Nov. 10, 2005) (applying Delaware law) (stating that derivative complaint failed to plead interest of director because, *inter alia*, there was no allegation establishing what percentage of director's total stock holding his sale represented); *Rattner*, 2003 WL 22284323, at *10 (noting that derivative complaint failed to provide particularized facts regarding the timing of the directors' trades in relation to permissible trading periods, the trading practices of the directors in prior years, and failure to pinpoint the allegedly illegal sales soon after the release of misleading statements).

### 3. Plaintiffs Have Not Established the Board's Substantial Likelihood of Liability for Failure of Oversight (*Caremark* Claim)

Plaintiffs also seek demand excusal on the grounds that the Outside Directors faced a substantial likelihood of liability for their failure to prevent the dissemination of press releases containing misleading statements about prospective uses of Celexa, Lexapro, Namenda, and Milnacipran. *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996), "articulates a standard for liability for failures of oversight that requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith." *Guttman*, 823 A.2d at 506. Liability under *Caremark* is premised "on a showing that the directors were *conscious* of the fact that they were not doing their jobs." *Id.* (emphasis added).

Plaintiffs argue that the Complaint "clearly allege[s] red flags which either must or should have alerted the Forest Board to the problems facing their core product line." (Pls.' Opp'n Mem. 18.) For the reasons already discussed at length above, plaintiffs' allegations purporting to establish the Outside Directors' knowledge of any negative studies on Celexa, or that such studies raised red flags as to the viability of Forest's

27

operations, are sorely lacking, and fail to support a showing of substantial likelihood of liability under *Caremark.*

Plaintiffs further posit that negative tests showing that Namenda was not effective to treat mild-to-moderate Alzheimer's waved another "red flag" to the Board. (*Id.*) However, the Complaint is devoid of allegations that the positive studies showing Namenda's efficacy for mild-to-moderate Alzheimer's were false or that the Board had knowledge of their falsity, or that negative studies were withheld. To the contrary, the allegations instead establish that negative studies failing to show the drug's efficacy for mild-to-moderate Alzheimer's were released *prior* to any statements by Forest announcing the positive study. (Compl. ¶¶ 135–38, 145, 144, 152–53.) While the FDA's decision not to approve Namenda for mild-to-moderate Alzheimer's disease is concededly a disappointing result, absent allegations of false statements or directorial knowledge of undisclosed adverse information, plaintiffs have not adequately alleged that the Outside Directors face a substantial risk of liability under *Caremark*.

Plaintiffs have "failed to 'plead with particularity what obvious danger signs were ignored or what additional measures the directors should have taken." *Halpert Enters., Inc. v. Harrison*, 2005 WL 1773686, at \*2 (S.D.N.Y. July 26, 2005) (applying Delaware law) (quoting *In re Baxter Int'l Inc. Sec. Litig.*, 654 A.2d 1268, 1271 (Del. Ch. 1995)); *see also Guttman*, 823 A.2d at 506–07 ("[Plaintiffs'] conclusory complaint is empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that . . . the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."); *Stone v. Ritter*, 2006 WL 302558, at \*2 (Del. Ch. Jan. 26, 2006) ("Plaintiffs fail to point to any facts either

showing how the [alleged] scheme, or any other problems at AmSouth, waved a 'red-flag' in the face of the board. Nor do plaintiffs point to facts suggesting a conscious decision to take no action in response to red flags. Without these well-pled allegations, there is no possibility the defendants faced a substantial likelihood of liability."); *In re Citigroup*, 2003 WL 21384599, at *2 ("There is nothing in the Amended Complaint to suggest or to permit the court to infer that any of [the alleged 'red flags'] ever came to the attention of the board of directors or any committee of the board.").

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss [17] is GRANTED. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: New York, New York
September 18, 2006

Richard J. Holwell
United States District Judge